IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEVEN BREITMAN, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 14-7843 (JBS/AMD) |
| NATIONAL SURETY CORPORATION, one of the Fireman's Fund Insurance Companies, | **MEMORANDUM OPINION** |
| Defendant. | |

**SIMANDLE, District Judge:**

Superstorm Sandy in October, 2012, left a path of
devastation in coastal communities in New Jersey and elsewhere,
and it resulted in about 2,000 lawsuits between homeowners and
their insurance companies seeking coverage for the storm-related
damages. A typical area of dispute can arise when the cause of
property damage must be ascribed either to wind and wind-driven
rain (generally covered by a standard homeowners policy) or by
flood and surges of a body of water (generally covered by a
flood insurance policy under the National Flood Insurance
Program and excluded by the standard homeowners policy). In this
case, the plaintiff-homeowner submitted claims under both his
homeowner's policy and his flood insurance policy, and the
respective carriers each paid part of his claim. The insurer for
homeowner's coverage denied a substantial part of his claim,

however, on the basis that the unpaid loss was caused by flooding or otherwise not covered by the policy, and plaintiff alleges this denial was made in bad faith, and in breach of the covenant of good faith and fair dealing implied in the homeowner's policy under New Jersey law.

In this action, Plaintiff Steven Breitman alleges, <u>inter alia</u>, that Defendant National Surety Corporation breached the covenant of good faith or fair dealing "and has otherwise acted in bad faith" in its response to his insurance claim arising out of Superstorm-Sandy-related damage to a house Plaintiff owned on the waterfront in Rumson, New Jersey, and is liable for that breach pursuant to New Jersey common law. [Docket Item 16, Am. Compl., Count Two, ¶¶ 83, 91-104.] Plaintiff also alleges, in Count One, that National Surety Corporation owes coverage for losses under the policy, and that claim is not the subject of the present motion; indeed, neither party has moved for summary judgment on the contract claim in Count One. Pending before the Court is Defendant's motion for partial summary judgment as to Count Two pursuant to Fed. R. Civ. P. 56. [Docket Item 57.] Plaintiff has filed a Response in Opposition [Docket Item 59], but failed to file any response to Defendant's Statement of Undisputed Material Facts, in violation of L. Civ. R. 56.1(a), and Defendant has filed a Reply [Docket Item 60]. For the reasons discussed below, the Court will grant Defendant's motion

for summary judgment as to the claim of bad faith and its
related arguments to strike certain claims for consequential
damages.

The principal issue presented is whether Plaintiff has
adduced factual evidence from which a reasonable jury could find
that National Surety Corporation lacked a fairly debatable
reason for denying the disputed portion of the claim.  Because
in this summary judgment motion National Surety has set forth
the factual basis for its determinations of coverage and loss,
and because Plaintiff has not come forward with evidence that
Plaintiff's entitlement to recover for these losses was so clear
that it was not fairly debatable, Plaintiff will be unable to
prove its bad faith claim in Count 2 and summary judgment will
be granted, as now discussed. The Court finds as follows:

1.   **Factual and Procedural Background**.[1] As this Court
previously stated, "Defendant denied Plaintiff's claim for loss

---

[1]For purposes of the instant motion and pursuant to L. Civ. R.
56.1, the Court looks to the Amended Complaint [Docket Item 16]
when appropriate, Defendant's Statement of Uncontested Material
Facts [Docket Item 57-2], and related exhibits and documents
[Docket Items 57-3 to -5; 59; 59-1; 60-1].
    The Court notes Plaintiff's counsel's noncompliance with
the dictates of L. Civ. R. 56.1(a), which requires the "opponent
of summary judgment" to "furnish, with its opposition papers, a
responsive statement of material facts, addressing each
paragraph of the movant's statement, indicating agreement or
disagreement and, if not agreed, stating each material fact in
dispute and citing to the affidavits and other documents
submitted in connection with the motion; any material fact not
disputed shall be deemed undisputed for purposes of the summary

and damage to Plaintiff's property caused by flood, not wind, as a result of Superstorm Sandy. Plaintiff asserts that the full amount of loss and damages was $711,798.55[], but Defendant only paid $114,181.06, and he alleges that Defendant conducted an improper adjustment, wrongfully denied his claim, and delayed payment." <u>Breitman v. Nat'l Surety Corp.</u>, No. 14-7843, 2015 WL 5723141, *1 (D.N.J. Sept. 29, 2015).

2.     In its well-documented Statement of Uncontested Material Facts [SUMF] filed with this motion and referencing each claimed fact to the record [Docket Item 57-2], Defendant sets forth the detailed basis for its determination to pay a total amount of $152,195.84 consisting of emergency repairs ($38,014.78) and permanent repairs ($114,181.06) attributable to wind and wind-driven rain from Superstorm Sandy. Because the Statement of Material Facts is uncontested, SUMF ¶¶ 1-39 will be set forth herein as follows:

    1.     Steven Breitman ("Plaintiff") is the owner of the home and real property located at 12 Broadmoor Drive in Rumson, New Jersey (the "Premises"). (Am. Compl. ¶ 1, Kuehn Decl., Ex. 1.)

    2.     National Surety insured the Premises subject to the terms, limitations, conditions,

_____

judgment." For that reason, the Court understands Plaintiff to agree that the contentions in Defendant's Statement of Uncontested Material Facts are deemed admitted for the purposes of summary judgment, and will consider them accordingly, as discussed below.

and exclusions of policy number NZD2525628 (the "Policy") with the policy period August 17, 2012 through August 17, 2013. (Am. Compl. ¶¶ 13 - 16.)

3.  On October 29, 2012, the Premises was damaged by the effects of the metorological [sic] event known as "Superstorm Sandy." ("Sandy") (Id. ¶ 23.) Specifically, Sandy affected the Premises in three ways. First, the garage and crawlspace of Plaintiff's home were inundated by water from the adjacent Navasink River. (Breitman Tr. at 107:24 - 108:2.) Second, high winds damaged portions of the exterior of the home. Third, wind-driven rain penetrated the home through openings in the roof, openings around windows, and openings around sliding doors. (Breitman Tr. 110:9 - 14; Paradis Decl., ¶ 8)

4.  Plaintiff notified National Surety of the damage on November 1, 2012. (Am. Comp. ¶ 37; Breitman Tr. at 101:22 - 102:9.) Plaintiff also notified his flood insurance carrier, American Bankers Insurance Company of Florida ("ABIC"), of the flood damage.

5.  ABIC paid Plaintiff a total of $202,381.18 for flood damage to the Premises caused by Sandy on or around May 21, 2013. (Kuehn Decl., ¶¶ 12 - 15, Exs. 11 - 5; Breitman Tr. at 122:15 - 123:11, 134:1 - 23; 138:19 - 139:18).

6.  Robert Paradis, an employee of National Surety, was eventually assigned to handle claim [sic] for damage to the Premises.  (Paradis Decl., ¶ 6.)

7.  Paradis inspected and photographed the Premises on November 7 and 20, 2012. (Paradis Decl., ¶ 10.)

8.  Paradis sent Plaintiff a letter dated November 18, 2012, that set forth, inter alia, the exclusions and limitations on coverage that might apply to Plaintiff's claim. (Paradis Decl., ¶ 11, Ex. 1.) The letter advised Plaintiff that flood damage to the Premises would not be covered by the Policy.

9.  In November 2012, Paradis retained the engineering firm Douglas G. Peterson and Associates ("DGPA") to inspect the Premises [sic] determine the cause of the damage related to Sandy, and to identify and segregate damage caused by flood from wind and rain damage, (Paradis Decl., ¶¶ 10, 12, 15.)

10. In December 2012, Paradis prepared an initial estimate to repair the damages to the Premises from wind and wind-driven rain. Paradis sent a copy of the estimate to Plaintiff on or about December 11, 2012. (Paradis Decl., ¶ 16, Ex. 2.)

11. On or about November 26, 2012, a Servpro franchise from Kentucky ("Servpro Kentucky") began performing emergency water extraction and dry-out at the Premises. National Surety eventually paid Servpro Kentucky $13,014.78 for the work it performed at the Premises, after Plaintiff approved that payment.  (Paradis Decl., ¶ 10.)

12. Keith Kallberg, P.E., an engineer affiliated with DGPA, inspected the Premises on December 7, 2012, and issued a report dated December 17, 2012 (the "DGPA Report"). (See Paradis Decl., ¶ 18, Ex. 3.) The DGPA Report concluded that:

    a. Sandy caused the adjacent river to overflow its natural boundaries an [sic] inundate portions of the Premises. The water entered the garage and crawlspace but did not reach the living area of the Premises;

    b. Wind-driven rain and water pooling on the surface of the roof penetrated the building envelope through pre-existing openings in the building, including cracks in the roof membrane and areas around windows and skylights;

    c. The pre-existing openings allow [sic] rain to enter the building before, after and

during Sandy, as evinced [sic] by wet and
dry water stains, as well as long term rot
around certain windows and door trim;

d. The roof was not damaged by wind, except for
two window shutter housing on the second
floor; and

e. The roof membrane had multiple pre-existing
cracks and was in poor overall condition and
near the end of its service life.

13. Thereafter, Plaintiff retained a Servpro
franchise from New Jersey ("ServPro New Jersey")
to complete the emergency dry-out and mitigation
started by Servpro Kentucky, and to remediate
mold that had developed at the Premises. (Paradis
Decl., ¶ 17.) National Surety directly paid
Servpro New Jersey $25,000.00 for its work at the
Premises.  (Paradis Decl., ¶ 20.)

14. Based upon the DGPA Report, on or about
December 27, 2012, Paradis prepared a revised
estimate using Xactimate software for the repair
of damage to the Premises caused by
wind and wind-driven rain. The supplemental
estimate totaled $57,065.03. (Paradis Decl.,
¶ 19, Ex. 4.)

15. Paradis sent the revised repair estimate to
Plaintiff on December 27, 2012, and in his cover
e-mail, requested that Plaintiff review and
advise of any questions or approve payment.
(See Paradis Decl., ¶ 19, Ex. 4.)

16. Paradis sent a follow-up email to Plaintiff
on January 23, 2013 asking if Plaintiff had
reviewed the revised estimate or obtained
invoices for other damages items. (Paradis
Decl., ¶ 21, Ex. 5.)

17. Between January of 2012 and August of 2013,
Paradis attempted to contact Plaintiff on twelve
occasions by telephone and e-mail about the
revised estimate and invoices and/or to request
repairs to the Premises.  Paradis sent Plaintiff
emails on the following dates:

a. January 23, 2013 (Paradis Decl., ¶ 21, Ex. 5.);
b. January 30, 2013 (Id, ¶ 22, Ex. 6.);
c. March 5, 2013 (Id. ¶ 23, Ex. 7);
d. March 15, 2013 (Id. ¶ 24, Ex. 8);
e. April 4, 2013 (Id. ¶ 25, Ex. 9);
f. April 17, 2013 (Id. ¶ 26, Ex. 10);
g. April 24, 2013 (Id. ¶ 27, Ex. 11);
h. May 8, 2013 (Id. ¶ 28, Ex. 12);
i. May 21, 2013 (Id. ¶ 29, Ex. 13);
j. July 17, 2013 (Id. ¶ 30, Ex. 14);
k. August 6, 2013 (Id. ¶ 32, Ex. 15.).

18. On August 9, 2013, Plaintiff sent Paradis an e-mail that attached a spreadsheet of items for which [he] intended to make a claim under the Policy with National Surety. (See Paradis Decl., ¶ 34, Ex. 16.) The list included ninety-one (91) individual items, twenty-one (21) of which included the amount being sought for a total of $223,804.72. The list includes several items of flood[-]related damage including repair and replacement of several decks, electrical repairs, and the phone system. Plaintiff did not include any invoices, estimates or other supporting documentation with the spreadsheet on August 9, 2013.

19. National Surety retained construction consulting firm Madsen, Kneppers & Associates, Inc. ("MKA") on August 15, 2013, to evaluate the items listed in the spreadsheet Plaintiff submitted on August 9, 2013, and to assist National Surety in verifying the scope of repair work needed to address property damage to the Premises caused by wind and rain. (Breheney Tr. 29:9 – 14.)

20. James Breheney, a construction consultant with MKA, inspected the property on August 21, 2013, with National Surety and Plaintiff. (Buckley Decl., ¶ 6.) Breheney measured the rooms and extensively documented and photographed the damage he observed at the Premises. (Breheney Tr. at 30:18 – 31:24.)

21. After the August 21, 2013 inspection, National Surety sent a partial denial and reservation of rights letter to Plaintiff, dated August 19, 2013. (Buckley Decl., ¶ 7, Ex. 1.)

22. At the request of National Surety, MKA prepared an Unpriced Scope of Work dated October 11, 2013. The purpose of the Unpriced Scope of Work was to itemize the scope of work needed to repair damage to the Premises caused by wind and wind-driven rain. (Breheney Tr. at 34:2 – 11.) A true and correct copy of the Unpriced Scope of Work is attached as Exhibit 3 to the Declaration of Michael R. Kuehn.

23. MKA recommended Servpro of Lansdale/Warminster ("Servpro Pennsylvania"), a local contractor, to prepare a repair bid based upon MKA's Unpriced Scope of Work. (Breheney Tr. at 60:11 – 61:2.)

24. Justin Isabell of Servpro Pennsylvania inspected the Premises in November of 2013 and submitted a competitive bid to repair the Premises[,] based upon the MKA Unpriced Scope of Work[,] in the amount of $114,181.06 (the "Servpro Bid"). (Buckley Decl., ¶ 8, Ex. 2; Isabell Tr. at 48:21 – 49:7.)

25. Servpro Pennsylvania followed up with Plaintiff to determine if Plaintiff wanted to retain it to perform the repairs set forth in the Servpro Bid. (Isabell Tr. at 39:10 – 40:4.)

26. Plaintiff did not hire Servpro Pennsylvania to repair his home. (Breitman Tr. at 223:10 – 224:4.)

27. National Surety sent Plaintiff a copy of the Servpro Bid on December 23, 2013, and asked him to please "[l]et me know your thoughts.". (Buckley Decl., ¶ 8, Ex. 2.)

28. Plaintiff did not provide any feedback to National Surety concerning the Servpro Bid. National Surety followed up with Plaintiff in March 2014 about the Servpro Bid, but received no

reply. (Kuehn Decl., ¶ 7, Ex. 6; Breitman Tr. at 225:25 – 226:8.)

29. National Surety e-mailed Plaintiff's insurance agent on April 9, 2014 and asked that she contact Plaintiff and direct him to respond to National Surety's inquiries and discuss the resolution of the claim. (Kuehn Decl., ¶ 8, Ex. 7; Breitman Tr. at 228:25 – 229:4.) The insurance agent complied by forwarding a copy of National Surety's email to Plaintiff. (Kuehn Decl., ¶ 8, Ex. 7.)

30. Plaintiff responded to his insurance agent by e-mail on April 10, 2014, stating that:

> I am having all the bills and proposals put together.
>
> I have reached out to a contractor to give me proposals for the balance of the work that I don't have bills or proposals already
>
> I will be away next week during this time my assistant will be assembling this
>
> I will send out everything that I have ready when I return
>
> I would like the insurance company (Fireman's) to send me an on account payment at that time.

(Kuehn Decl., ¶ 9, Ex. 8; Breitman Tr. at 229:13 – 31.)

31. Plaintiff, his insurance agent and National Surety participated in a conference call on June 19, 2014. During that call, Plaintiff authorized National Surety to issue payment for damage to his home in the amount of the Servpro Bid ($114,181.06). National Surety's adjuster e-mailed Plaintiff the same day and advised that National Surety would release a payment in that amount. In that e-mail, National Surety also asked Plaintiff to "forward any estimates and invoices you have relative to the damages at your

house so we can confirm how to proceed." (Buckley Decl., ¶ 8, Ex. 3.)

32. National Surety issued a check to Plaintiff in the amount of $114,181.06 on June 19, 2014. (Buckley Decl., ¶ 14, Ex. 8.)

33. National Surety's adjuster followed-up his e-mail request of June 19, 2014 with another e-mail dated July 9, 2014. In the July 9, 2014 e-mail, the adjuster again requested invoices and estimates from Plaintiff. (See Buckley Decl., ¶ 10, Ex. 4.)

34. On August 6, 2014, a public adjuster retained by Plaintiff forwarded a repair estimate for the Premises prepared by Mejor Consulting Corporation in the amount of $461,930.35. (Buckley Decl., ¶ 11, Ex. 5.)

35. Plaintiff, through his public adjuster, submitted a Sworn Statement in Proof of Loss to National Surety's adjuster on October 16, 2014. (Buckley Decl. ¶ 12, Ex. 6.)

36. Kevin Buckley of National Surety rejected the Proof of Loss by letter dated October 20, 2014. (Buckley Decl., ¶ 13, Ex. 7.)

37. In May of 2013, Plaintiff purchased a six-bedroom yacht named Persian for $3.35 million. (Breitman Tr. 75:12 – 78:20.)

38. Between October 29, 2012 through June 13, 2016, Plaintiff had the financial resources to make any and all repairs he now claims are necessary to the Premises. (Breitman Tr. at 256:15 – 258:5.)

39. Plaintiff did not use the money received from ABIC or National Surety to make repairs to the Premises necessary to make the Premises habitable. (Breitman Tr. at 140:21 – 141:4; 224:6 – 10).

3. Plaintiff's counsel has not addressed <u>any</u> of the above facts from Defendant's SUMF, and thus these facts are deemed undisputed for purposes of this motion, pursuant to L. Civ. R. 56.1(a), which provides as follows:

> On motions for summary judgment, the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion. A motion for summary judgment unaccompanied by a statement of material facts not in dispute shall be dismissed. The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion. In addition, the opponent may also furnish a supplemental statement of disputed material facts, in separately numbered paragraphs citing to the affidavits and other documents submitted in connection with the motion, if necessary to substantiate the factual basis for opposition. The movant shall respond to any such supplemental statement of disputed material facts as above, with its reply papers. Each statement of material facts shall be a separate document (not part of a brief) and shall not contain legal argument or conclusions of law.

The consequence of Plaintiff's unexplained[2] failure to follow the clear command of L. Civ. R. 56.1(a) by filing a responsive

---

[2] Even after Defendant repeatedly noted Plaintiff's counsel's deficient opposition under L. Civ. R. 56.1(a) in Defendant's Reply Br. [Docket Item 60 at 2], Plaintiff did not seek leave to cure this glaring deficiency.

statement of material facts addressing each factual assertion in SUMF ¶¶ 1-39 is that the Court will accept Defendant's facts as established.

4.   The only factual material Plaintiff introduces in opposing Defendant's motion appears in a Certification of Robert T. Trautman, Esq. [Docket Item 59-1] which attaches excerpts of the deposition of Robert Paradis (Ex. A), Defendant's claim notes (Ex. B), and eight internal emails (Ex. C-J).

5.   At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, the court is required to examine the evidence in light most favorable to the non-moving party, and resolve all reasonable inferences in that party's favor. Hunt v. Cromartie, 526 U.S. 541, 552 (1999); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at
248. A factual assertion in the movant's Rule 56.1(a) SUMF,
citing to the record, is deemed undisputed when the opponent
fails to dispute it with its own counter-citation to the record.

6.  New Jersey law provides the rule of decision in this
case, in which this Court's jurisdiction is based upon diversity
of citizenship, 28 U.S.C. § 1332. New Jersey courts recognize
claims of bad faith in the context of insurance disputes for
both bad faith in denial of benefits and bad faith in delay of
processing of claims. <u>Pickett v. Lloyd's</u>, 131 N.J. 457, 467-77
(1993). The <u>Pickett</u> Court stated that the test of a bad faith
claim is best understood as the proposition that "[i]f a claim
is 'fairly debatable,' no liability in tort will arise. . . . To
show a claim for bad faith, a plaintiff must show the absence of
a reasonable basis for denying benefits of the policy and the
defendant's knowledge or reckless disregard of the lack of a
reasonable basis for denying the claim." <u>Pickett</u>, 131 N.J. at
473 (quoting <u>Bibeault v. Hanover Ins. Co.</u>, 417 A.2d 313, 319
(R.I. Sup. Ct. 1980))(further citations omitted). The New Jersey
Supreme Court also suggested that in a delayed-payment context,
a claim for bad faith could be sustained where an insurer
"unreasonably and intentionally had delayed payment on
undisputed claims[,]" <u>Pickett</u>, 131 N.J. at 478-79 (citing
<u>Chester v. State Farm Ins. Co.</u>, 789 P.2d 534, 537 (Ct. App. Id.

1990)). It also stated that a bad-faith claim for delayed payment would sound where (1) an "insurer's conduct [in delaying the processing of a valid claim] is unreasonable and (2) the insurer knows that the conduct is unreasonable or recklessly disregards the fact that the conduct is unreasonable." Pickett, 131 N.J. at 474 (citing Travelers Ins. Co. v. Savio, 706 P.2d 1258, 1275 (Sup. Ct. Colo. 1985)).

7.     Because of the nature of this test, the Pickett Court stated, "[u]nder the 'fairly debatable' standard, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim [e.g., the breach of the insurance contract] would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim." Pickett, 131 N.J. at 473. Here, Plaintiff has not cross-moved for summary judgment upon this claim for breach of contract, nor has Plaintiff explained why he would be entitled to summary judgment because the insurer's liability to pay the claim is so clear.

8.     Plaintiff avers that "the entire defense motion is based" upon "th[e] 'fairly debatable' standard." [Docket Item 59 at 5.] Plaintiff continues: "However, more recently, the court in Taddei v. State Farm Indemnity Co. elaborated on the first-party bad faith standard: 'Although a fairly debatable claim is a necessary condition to avoid liability for bad faith, it is not always a sufficient condition. Rather, we are satisfied that

15

the appropriate inquiry is whether there is sufficient evidence
from which reasonable minds could conclude that in the
investigation, evaluation, and processing of the claim, the
insurer acted unreasonably and either knew or was conscious of
the fact that its conduct was unreasonable.' 401 N.J. Super.
449, 462 ([App. Div.] 2008)(quoting Skaling v. Aetna Ins. Co.,
799 A.2d 997, 1011 (R.I. 2002))." [Docket Item 59 at 5.]
Plaintiff then concedes that "New Jersey law has not yet caught
up with other states in further defining bad faith in the first
party context," but offers the argument that this Court should
disregard the tenets of New Jersey law and look to the decisions
of courts in other jurisdiction for persuasive authority. Id.

    9.    The thrust of the remainder of Plaintiff's argument
appears to center on his contention that Defendant's conduct in
"investigation, evaluation, and processing of the claim" was
unreasonable in several respects, subjecting it to liability for
bad faith. Id. at 6-7. For instance, Plaintiff avers that "the
Defendant actually took affirmative steps to delay and
improperly deny the Plaintiff's claim[,]" including "knowingly
assign[ing] incompetent and unqualified adjusters" to work on
his claim, having a manager allegedly "advise[ an] adjuster to
deny the proof of loss sight unseen[,]", and allegedly having a
manager "direct[ adjusters] to wait out the statute of

16

limitations in hopes that the Plaintiff will miss their [sic] opportunity to file a lawsuit[.]" <u>Id.</u> at 6-9.

10.  Plaintiff devotes no more than cursory, conclusory statements directed at whether Defendant's denial of coverage and/or processing delays were "fairly debatable": "Here, the evidence demonstrates that, not only was the Plaintiff's claim not fairly debatable, but the Defendant actually took affirmative steps to delay and improperly deny the Plaintiff's claim" (<u>id.</u> at 6); and, "Thus, while the Plaintiff denies that the claim was fairly debatable, it is clear from the Defendant's file that there was a systematic failure to act in good faith[,]" referring again to the allegations contained in ¶ 7, <u>supra</u> (<u>id.</u> at 10), which are mere generalities.

11.  Finally, Plaintiff cites to the case of <u>Bello v. Merrimak Mut. Fire Ins. Co.</u>, No. L-781-09, 2012 WL 2848642, *4-*7 (N.J. App. Div. July 12, 2012). In that case, although a plaintiff in an insurance dispute case "ultimately failed to obtain the full amount of damages he sought[,]" arguably "lost the underlying claim and was paid less than the initial estimate prepared by the insurance carrier[,]" the plaintiff was nevertheless permitted to amend his complaint to add a claim alleging bad faith based on the insurer's delay; the claim went to the jury "and resulted in a significant bad faith verdict[,]" as the total verdict "exceed[ed] $850,000 for the policyholder"

including "almost $225,000 in attorneys' fees and costs."
[Docket Item 59 at 11.] Accordingly, Plaintiff states, Bello
demonstrates that "a [p]laintiff need not obtain a breach of
contract verdict or establish a lack of a fairly debatable claim
in order to sustain a bad faith claim." Id.

12. The Court takes notice of the fact that Plaintiff has
not filed a motion for summary judgment on his underlying
substantive claims for breach of contract for the denial of
partial coverage; nor has the Court sua sponte concluded that no
reasonable finder of fact could find that Defendant did not
breach its contract with Plaintiff. Of course, as stated
earlier, when summary judgment for the plaintiff-insured is not
warranted on the underlying claim, that plaintiff cannot
maintain a claim of bad faith. Pickett, 131 N.J. at 473.

13. In 2015 (i.e., after both Bello and Taddei), the New
Jersey Supreme Court reiterated its adherence to the test
announced in Pickett for bad-faith claims: "[T]o establish a
first-party bad faith claim for denial of benefits in New
Jersey, a plaintiff must show 'that no debatable reasons existed
for denial of the benefits.' [Pickett, 131 N.J.] at 481 . . . .
Under the salutary 'fairly debatable' standard enunciated in
Pickett, 'a claimant who could not have established as a matter
of law a right to summary judgment on the substantive claim
would not be entitled to assert a claim for an insurer's bad

faith refusal to pay the claim.' Id. at 473 . . . . ." Badiali v.
New Jersey Mfrs. Ins. Grp., 220 N.J. 544, 554-55 (2015). This
ruling came directly in response to the urging of amici curiae
for the court "to depart from its rigid adherence to Pickett's
'fairly debatable' approach so as to allow for a determination
of bad faith where an insurer acts intentionally or recklessly
in a manner contrary to its role as fiduciary." Badiali, 220
N.J. at 552. Plaintiff never addresses the Badiali decision and
its clear affirmation of the Pickett standard for bad faith
denial of an insurance claim.

14.   Given the clear statement of the court in Badiali that
it continues to apply the "fairly debatable" standard enunciated
in Pickett, the Court must apply that standard as well, and
declines Plaintiff's invitation to import additional or
replacement tests from courts of other jurisdictions more to
Plaintiff's liking but irrelevant herein as a matter of law. See
also Product Source International, LLC v. Foremost Signature
Ins. Co., 195 F. Supp. 3d 660, 666 (D.N.J. 2016)(applying
Pickett's "fairly debatable" standard to a bad faith claim);
Benjamin v. State Farm Ins. Co., No. 15-4123, 2017 WL 3535023,
*20 (D.N.J. Aug. 17, 2017)(same). The Court further notes that
Taddei's quotation of Skaling comes in the context of the Taddei
court's expression of "some reservation as to whether Pickett's
'fairly debatable' formulation, based on the summary judgment

standard, should apply when evaluating good faith in failing to settle an unliquidated bodily injury claim, as opposed to an undisputed property damage claim." Taddei, 401 N.J. Super. at 462.

15.    Accordingly, the Court will consider whether a reasonable finder of fact could conclude that Defendant's decision to partially deny coverage was fairly debatable. If the answer is yes, then the Court will grant summary judgment to Defendant on Plaintiff's claim of bad faith in keeping with New Jersey law.

16.    Defendant points to evidence in the record (and Plaintiff does not dispute) that its decision to pay $114,181.06 for repairs to the premises relating to covered wind and rain damage, as well as $38,014.78 directly to moisture remediation contractors, was based on "the advice, opinions and proposals of . . . qualified and professional consultants and a licensed contractor[.]" [Docket Item 57-1 at 11.] It suggests, and the Court agrees, that this supports the contention that its decision was fairly debatable under New Jersey law. Id. (citing Tarsio v. Provident Ins. Co., 108 F. Supp. 2d 397 (D.N.J. 2000); Onex Credit Partners, LLC v. Atrium 5 Ltd., No. 13-5629, 2014 WL 4798758, *7-*10 (D.N.J. Sept. 26, 2014); Ketzner v. John Hancock Mut. Life Ins. Co., 118 Fed. App'x 594, 599 (3d Cir. 2004).

17.  Defendant next argues that the evidentiary record
shows that its decision to deny coverage for damage to the
covered premises caused by flooding from the adjacent Navasink
River was fairly debatable as well, stating that the policy at
issue contained a flood exclusion (including storm surge) which
has been upheld as valid by courts applying New Jersey law.
[Docket Item 57-1 at 12.] Defendant states: "That Plaintiff may
disagree with National Surety about which items of property were
damaged by flood is irrelevant. Based on the Water Damage
exclusion, New Jersey law, and the conclusions in the DGPA
report, coverage for flood damage to the Premises was, at the
very least, fairly debatable." [Id. at 13.]

18.  While the Court understands this position, it would
seem that a bad-faith claim based on a denial of coverage for
allegedly flood-damaged property could be sustained where an
insurance company denied coverage for such damage to property
that was not fairly-debatably damaged by flood (and related
processes or phenomena, as contemplated in the policy at issue
here). Put differently, an insured could maintain a bad-faith
claim if the insurer denied coverage on flood exclusion grounds
to property that was known to be, beyond a dispute of genuine
material fact, not flood-damaged. If, for instance, a second-
floor wall of an insured dwelling were undoubtedly damaged by
rain and wind rather than flood or storm surge, it would

constitute bad faith for the insurer to deny coverage for that upper-level wall on the grounds of a flood exclusion; such denial would not be "fairly debatable." This is so simply as a matter of logic, even though courts applying New Jersey law uphold flood exclusions as a general matter. See, e.g., Assurance Co. of America, Inc. v. Jay-Mar, Inc., 38 F. Supp. 2d 349, 354-55 (D.N.J. 1999).

19.   Thus, the question presented is whether Defendant's payment of damages to the premises from wind and wind-driven rain, whether ultimately correct, was at least "fairly debatable" and therefore not a basis for a bad faith claim. The undisputed facts establish that National Surety assigned Robert Paradis to handle the Breitman claim under the homeowners policy [SUMF ¶ 6], and that Paradis inspected and photographed the premises on November 7 and 20, 2012 (within days after Plaintiff notified National Surety of his loss on November 1, 2012). [SUMF ¶ 7]. Paradis noted that flood damage would not be covered due to the policy exclusion, and he so advised Plaintiff on November 18, 2012 [SUMF ¶ 8] and retained the engineering firm Douglas G. Peterson and Associates ("DGPA") to inspect the premises and to separate the damage caused from flood from that caused by wind and rain [SUMF ¶9]. Indeed, Plaintiff's premises had sustained major flood damage in Superstorm Sandy, and Plaintiff's flood

carrier, ABIC, eventually paid a total of $202,381.18 for flood damage on May 21, 2013. [SUMF ¶ 5-6].

20. National Surety undertook plausible steps to adjust the claim after hiring DGPA. For example, Paradis prepared an initial estimate addressing the wind and rain damage and its expected repair costs and sent it to Plaintiff on December 11, 2012. [SUMF ¶ 10]. National Surety paid for emergency water extraction, dry-out, and mold remediation, issuing payments totaling $38,014.78 for these services. [SUMF ¶¶ 11 & 13]. DGPA's Professional Engineer, Keith Kallberg, inspected the premises and issued the DGPA report on December 17, 2012, outlining the findings regarding wind and rain damage [SUMF ¶ 12], which became a basis for Paradis to issue a revised estimate of covered damages totaling another $57,065.03 [SUMF ¶ 14], which Paradis e-mailed to Plaintiff on December 27, 2012 [SUMF ¶ 15]. Plaintiff did not respond. Paradis, on behalf of National Surety, attempted on 12 occasions to contact Plaintiff between January 23, 2013 and August 6, 2013 [SUMF ¶ 17] before Plaintiff finally sent an e-mail back to Paradis identifying items for which Plaintiff intended to make a claim as of August 9, 2013. [SUMF ¶ 18.] Plaintiff's list did not include any documentation such as invoices or estimates, simply a spreadsheet seeking $223,804.72, which included items of flood-related damage such as repair and replacement of several decks,

23

electrical repairs, and the phone system. [Id.] National Surety
promptly retained the consulting firm Madsen, Kneppers &
Associates, Inc. ("MKA") on August 15th to evaluate Plaintiff's
August 9th spreadsheet [SUMF ¶ 19], whereupon MKA's James
Breheney inspected the property with Plaintiff, taking photos
and measurements, from which MKA itemized the scope of work
needed to repair wind and rain damage, from which a contractor
(ServPro Pennsylvania) prepared a repair bid [SUMF ¶¶ 20, 22-23]
in the amount of $114,181.06 [Id. ¶ 24], which National Surety
sent to Plaintiff on December 23, 2013. [Id. ¶ 27]. Despite
National Surety's efforts, Plaintiff made no reply for almost
four more months, until April 10, 2014 [SUMF ¶ 30], indicating
he would be putting his proposals together and hiring a
contractor. [Id.] Finally, in a conference call on June 19,
2014, Plaintiff authorized National Surety to release the
payment check to him on account in the amount of $114,181.06.
[SUMF ¶ 31].

     21.  National Surety issued its $114,181.06 check to
Plaintiff on June 19, 2014 [SUMF ¶ 32] and again invited
Plaintiff to submit invoices and estimates for Plaintiff's
version of the claimed damages, and on August 6, 2014, Plaintiff
forwarded a repair estimate for $461,930.35 [id. ¶ 34], followed
by a sworn statement in proof of loss on October 16, 2014 [id. ¶

35], which National Surety rejected by letter of October 20, 2014 [id. ¶ 36].

22.  While disagreeing with National Surety's valuation of wind and rain damages, Plaintiff does not demonstrate, with facts, why Plaintiff's unpaid loss claim was not fairly debatable, nor why National Surety's determination was not at least arguably tethered to the facts and circumstances of the disputed loss.

23.  Far from demonstrating that its items of claimed damage were beyond dispute, Plaintiff's opposition consists of assertions that National Surety intentionally delayed payment of the claim in hopes that Plaintiff would exceed the statute of limitations. As to the assertion of bad faith delay, the factual record again demonstrates no genuine dispute of material fact, and that Defendant is entitled to judgment as a matter of law.

24.  As to a bad faith claim premised on delay rather than denial of coverage, Defendant argues that the uncontested facts show that "no reasonable jury could conclude that any delay in the processing of Plaintiff's claim for property damages rises to the level of bad faith delay that supported liability in Chester, particularly where the undisputed facts reveal that the delay resulted from Plaintiff's non-responsiveness and failure to cooperate." [Docket Item 57-1 at 14.] Defendant describes the sequence of events in its Response (id. at 14-18) and analogizes

to <u>Mennen Co. v. Atlantic Mut. Ins. Co.</u>, No. 93-CIV-5273, 1999 WL 33654297, *1, *25 (D.N.J. Oct. 26, 1999), where the court "granted summary judgment to an insurer on an insured's claim of bad faith delay" relying on "undisputed evidence showing that the insured's 'own failure to provide necessary information resulted in the delays[.]'" [Docket Item 57-1 at 18-19.] The Court agrees that, on the facts undisputed here by Plaintiff, the evidentiary record would not support a finding of a bad faith delay by Defendant. Namely, as Defendant's SUMF demonstrates, National Surety promptly investigated the damage to the premises, retained experts and a licensed contractor to evaluate it, and shared its findings with Plaintiff at each phase. On the other hand, Plaintiff failed to pursue his claim by submitting responsible estimates backed by documentation, remaining unresponsive for many months at a time (from at least December 27, 2012 until August 7, 2014 and again from December 23, 2013 to April 10, 2014). Plaintiff failed to submit a documented Sworn Statement in Proof of Loss until October 16, 2014, nearly two years after the storm and indeed four months after National Surety issued its $114,181.06 check to Plaintiff. Where the insurer issues its check for full payment of the loss that its adjuster, outside consultant, and licensed contractor have determined, at a time when Plaintiff had not even submitted his Sworn Statement in Proof of Loss despite being urged to do

so for more than a year, no reasonable fact finder could find

bad faith delay processing and payment by National Surety.

    25.  Finally, Plaintiff's rhetorical assertions that bad

faith is demonstrable from assigning incompetent and inattentive

claims adjusters who were "repeatedly told ... to sit back and

wait for the statute of limitations to run out in the hopes that

the Plaintiff would miss the filing deadline" (Opp. at 8) are

next considered. Contrary to Plaintiff's unsupported assertion,

National Surety's Large Loss Director Peter Alosky instructed

claim adjuster Kevin Buckley to remind Plaintiff's

representatives in writing that the policy contained a two-year

suit limitation condition [Kevin Buckley Dep. Tr. at 221:18-

222:18, at Ex. 1 to Decl. of Michael R. Kuehn [Docket Item 60-

1], and Buckley did exactly that. The letter Buckley sent to

Plaintiff's representative on October 20, 2014 called attention

to the suit limitation in advance of the approaching deadline.

[Kuehn Dec. at Ex. 2.] Plaintiff timely filed suit in response.

    26.  Likewise, the notion that National Surety

intentionally assigned incompetent claims adjusters to

Plaintiff's case derives from excerpts of internal National

Surety e-mails on various dates from August 13, 2013 to October

20, 2014. (Trautmann Cert. Exs. 4-11.) In the light most

favorable to Plaintiff, the e-mails tend to show that an early

adjuster on the file -- Eric Schwalbach -- was criticized by his

supervisor, Mr. Alosky, for not documenting the file as he should have, and he was replaced. The next adjuster on the file (Laurie Stover) was critical of Schwalbach, but there is no indication that she failed to act to process the claim. In short, while Plaintiff is entitled to reasonable inferences from facts in the record, there is no inference, much less evidence, that National Surety tolerated incompetence or inattentiveness in processing this claim. That Schwalbach temporarily failed to address the potential claim does not give rise to a material factual dispute, as it is undisputed that proper investigation was undertaken, results were shared and explained to Plaintiff and Plaintiff's agent, and the claim file was put squarely on track as directed by the management. That there remains an area of disputed claims, as alleged in Count One, does not imply that those disputes were caused by National Surety's deliberate indifference to a proper investigation and claims adjustment process.

27.  For these reasons, no reasonable fact finder could find that National Surety is liable for bad faith delay in paying Plaintiff's claim, nor that National Surety was indifferent to the duty to properly investigate and pay valid claims. Defendant is therefore entitled to summary judgment dismissing Plaintiff's claim for bad faith in its claims processing.

28.   Defendant next renews its argument that Plaintiff's
demand for attorney fees as consequential damages should be
dismissed pursuant to New Jersey law. [Docket Item 57-1 at 19-
21.] The New Jersey Supreme Court has stated that N.J. Court
Rule 4:42-9(a)(6), which provides for attorney fees "[i]n an
action upon a liability or indemnity policy of insurance, in
favor of a successful claimant," "does not apply when the
insured brings direct suit against his insurer to enforce
casualty or other direct coverage." Auto Lenders Acceptance
Corp. v. Gentilini Ford, Inc., 181 N.J. 245, 280 (2004)(citing
Eagle Fire Prot. Corp. v. First Indem. of Am. Ins. Co., 145 N.J.
345, 363 (1996)). However, the Court is of the opinion that
attorney fees may be recoverable as consequential damages on a
claim of bad faith. See Breitman v. Nat'l Surety Corp., No. 14-
7843, 2015 WL 5723141, *6 (D.N.J. Sept. 29, 2015) [Docket Item
14 ¶ 20] (citing Pickett, 131 N.J. at 481, and Taddei, 401 N.J.
Super. at 461). Because the Court is granting summary judgment
to Defendant regarding bad-faith claims premised on partial
denial of coverage or premised on intentional delay, Plaintiff
will be precluded from recovering attorney's fees and costs
herein by force of New Jersey law in Auto Lenders and Eagle
Fire, supra.

29.   Finally, Defendant argues that Plaintiff may not
recover for any consequential damages that arose as a result of

his decision not to reasonably mitigate the loss of use of the premises. [Docket Item 57-1 at 21.] Defendant argues that there is no genuine dispute of material fact that Plaintiff had the resources to "repair and make the Premises habitable so as to avoid a loss of use" and nevertheless took no "reasonable measures" "to mitigate the loss of use[,]" arguing in support that "Plaintiff testified during his deposition that he had more than enough money to repair his home even without" the disputed insurance payments. Id. at 21-22. Defendant's SUMF also adduces facts of Plaintiff's clear financial ability to have made any and all repairs he now claims are necessary for the premises [SUMF ¶¶ 38-39], which Plaintiff fails to dispute under L. Civ. R. 56.1(a).

30.  "It is well settled that injured parties have a duty to take reasonable steps to mitigate damages." McDonald v. Mianecki, 79 N.J. 275, 299 (1979). "Damages will not be recovered to the extent that the injured party could have avoided his losses through reasonable efforts without undue risk, burden or humiliation." Ingraham v. Trowbridge Builders, 297 N.J. Super. 72, 82-83 (App. Div. 1997)(citing Restatement (Second) of Contracts, § 350(1),(2) (1981)). In his Response, Plaintiff does not contest this argument. [Docket Item 59.] Accordingly, "the Court deems the issue conceded." Moorestown Tp. Bd. of Educ. v. S.D., 811 F. Supp. 2d 1057, 1085 (D.N.J.

2011). The Court agrees that there is no genuine dispute of material fact from which a reasonable fact finder could conclude that Plaintiff took reasonable steps to mitigate consequential damages stemming from loss of use of the premises. For that reason, the Court will grant Defendant's motion for summary judgment as to claims for consequential damages for loss of use, finding as a matter of law that Plaintiff undertook no efforts to mitigate his loss and avoid further damages despite clear ability and incentive to do so.

31. Accordingly, the Court will grant Defendant's motion for summary judgment dismissing the bad faith claims in Count Two, as well as for attorney's fees and consequential damages for loss of use of the premises arising from partial denial of part of Plaintiff's wind and wind-driven rain claims. The accompanying Order will be entered.


**March 28, 2018**                    **s/ Jerome B. Simandle**
Date                                   JEROME B. SIMANDLE
                                       U.S. District Judge